**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| Plaintiff/Respondent, | § § | |
| V. | § § | CR. No. C-06-415 |
| | § | C.A. No. C-07-445 |
| EFRAIN GARCIA-GONZALEZ, | § § | |
| Defendant/Movant. | § | |

**MEMORANDUM OPINION AND ORDER
DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE AND
<u>ORDER DENYING CERTIFICATE OF APPEALABILITY</u>**

Pending before the Court is Efrain Garcia-Gonzalez's ("Garcia-Gonzalez") motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. (D.E. 151.)[1] The Court has considered Garcia-Gonzalez's supplemental response (D.E. 176), filed pursuant to the Court's order that he supplement his claim that his counsel failed to appeal. The Court has also considered the government's combined response and motion to dismiss and Garcia-Gonzalez's reply. (D.E. 177, 179.)

On August 14, 2009, the Court held an evidentiary hearing to address Garcia-Gonzalez's claim that he received ineffective assistance of counsel due to counsel's alleged failure to appeal as requested. Garcia-Gonzalez was represented at the hearing by appointed counsel, Michele Villarreal-Kuchta.

For the reasons set forth on the record at the conclusion of the hearing, and for the reasons

---

[1] Docket entry references are to the criminal case, Cr. No. C-06-415.

1

set forth in more detail herein, the Court denies Garcia-Gonzalez's § 2255 motion. The Court also denies Garcia-Gonzalez a COA.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

## II. BACKGROUND

**A.      Criminal Proceedings**

The factual and procedural background of the case are set forth in the Court's order setting the case for an evidentiary hearing (D.E. 180 at 2-3), and familiarity with that order is assumed. As noted therein, Garcia-Gonzalez initially proceeded to trial, but after two days of trial elected to plead guilty to Counts One and Two of the indictment. There was no written plea agreement. Garcia-Gonzalez was represented at trial, at his plea and at sentencing by retained counsel, John Gilmore.

The Presentence Investigation Report prepared by the Probation Office determined that the base offense level for the offense of conspiracy to transport an unlawful alien was 12, but that various factors in Garcia-Gonzalez's case increased that base offense level. Specifically, his base offense level was 22 due to him being held accountable for the transportation of 29 illegal aliens (+6 levels), reckless endangerment (+2 levels) and his prior conviction for a felony immigration and naturalization offense (+2 levels). (PSR at ¶ 20.) The PSR also recommended that Garcia-Gonzalez's offense level be increased by four levels due to his role as an organizer or leader pursuant to U.S.S.G. § 3B1.1(a),[2] for a total offense level of 26. (PSR at ¶ 22.) It did not recommend any adjustment for acceptance of responsibility. (PSR at ¶ 25.) When coupled with his

---

[2] All citations to the Sentencing Guidelines are to the 2005 edition, which was used in Garcia-Gonzalez's case. (PSR at ¶ 19.)

criminal history category of II, his advisory guideline range was 70 to 87 months. (PSR at ¶ 52.)

The case was called for sentencing on December 15, 2006. At the beginning of the sentencing, Mr. Gilmore informed the Court that the defendant had reached an agreement with the government that the government would request a two-level reduction for acceptance of responsibility. (D.E. 173, Sentencing Transcript ("S. Tr.") at 3-4.) The prosecuting Assistant United States Attorney indicated her agreement with that, and the Court ultimately gave Garcia-Gonzalez a two-level reduction for acceptance of responsibility. (S. Tr. at 4.) The reduction reduced his advisory guideline range to 57 to 71 months. (Id.)

The Court sentenced Garcia-Gonzalez to 67 months in the custody of the Bureau of Prisons, to be followed by a three-year term of supervised release. Notably, at the conclusion of the sentencing hearing, immediately after imposing the sentence, the Court made sure that Garcia-Gonzalez understood his right to appeal. The Court stated: "There was no plea agreement in this case. Therefore, I will advise you at this time that you have the right to appeal this sentence. If you are unable to hire an attorney, the Court will appoint one for you. Do you understand that you have that right?" (S. Tr. at 10.) Garcia-Gonzalez responded, "Yes." (Id.) The following exchange then took place:

> MR. GILMORE:[3] The only thing I have, Your Honor, is Mr. Garcia-Gonzalez has expressed some concern over my performance in this case, and should he give notice of appeal, I would request the Court to appoint someone besides myself to represent him on appeal.
>
> THE COURT: I prefer that you do this, file a written motion, if he does, so that we can track it okay. And be sure that you explain to him that he has ten days from the day this judgment is entered to file

---

[3] The sentencing transcript repeatedly refers to "Mr. Gilbert," rather than Mr. Gilmore, a typographical error. It is clear from the minutes and the Court's own recollection that Mr. Gilmore was the individual speaking the words attributed to "Mr. Gilbert."

>  his notice of appeal. I am getting an awful lot of late notices, and you know, they get to jail and start talking to people, start getting advice, a whole lot of work for the Court of Appeals and as well as this Court.
>
>  If you are going to appeal, you have ten days from the time I enter that judgment to file your notice of appeal. All right, good luck to you.
>
>  MR. GILMORE:   Thank you, Judge.

(S. Tr. at 10-11.)

Garcia-Gonzalez did not appeal. He timely filed his § 2255 motion.

## B.   Evidentiary Hearing

On August 14, 2009, the Court held an evidentiary hearing to address Garcia-Gonzalez's claim that he told Gilmore to appeal and that Gilmore failed to do so. Gilmore and Garcia-Gonzalez both testified, as did Gilmore's wife, Patricia Gilmore. Mrs. Gilmore served as a Spanish-English interpreter during all conversations between Gilmore and Garcia-Gonzalez, including their meeting immediately following sentencing. Both of the Gilmores testified that, immediately following the sentencing, Mr. Gilmore consulted with Garcia-Gonzalez about his right to appeal, and told him that he had 10 days to appeal. Both of the Gilmores also testified that Garcia-Gonzalez never told them that he wanted to appeal, either in that conversation, or in any subsequent phone call, letter, or conversation.

Mr. Gilmore expressly testified that he was "absolutely positive" that Garcia-Gonzalez did not tell him to file a notice of appeal. He testified that filing a Notice of Appeal is not a difficult task, that it would take less than an hour, and that if a client asks him to appeal, he files a Notice of Appeal immediately. It is Gilmore's understanding that, as retained counsel, his representation does not conclude until either a Notice of Appeal is filed or the 10-day period for appealing expires. He

4

thus explained that he told Garcia-Gonzalez, as he had told the Court at sentencing, that if Garcia-Gonzalez wanted to appeal, that he would file the appeal but then move to withdraw, in light of the difficulties he and Garcia-Gonzalez were having.

Garcia-Gonzalez's testimony stood in stark contrast both to the Gilmores' testimony at the evidentiary hearing and his earlier supplemental statement filed with the Court. (D.E. 176.) In his supplemental statement, Garcia-Gonzalez told the Court that he instructed Gilmore to file an appeal on the date of his sentencing, and that he made the request both in person and in writing. He specifically stated that he made the verbal request in the "holding cell that is out by the courtroom," and that he, Gilmore, and Gilmore's interpreter or secretary was present and translating. (D.E .176 at 2.)

At the evidentiary hearing, Garcia-Gonzalez testified that Gilmore did not speak with him about his right to appeal immediately following the sentencing or at any time. He claims that he did not want to speak to Mr. Gilmore because Mr. Gilmore had said he was not going to help with an appeal. He testified that the only time he asked Mr. Gilmore to appeal was in a letter that he mailed from the Victoria jail within ten days of sentencing. Garcia-Gonzalez did not have a copy of the letter and Mr. Gilmore testified that the only letter he received from Garcia-Gonzalez after sentencing was approximately one year later, and that letter did not indicate that Garcia-Gonzalez intended to appeal.

Garcia-Gonzalez also candidly admitted that he did not call Mr. Gilmore at any point to inquire about the status of his appeal, nor did he ever contact the Court to ask about an appeal.

As the Court stated at the conclusion of the hearing, it was faced with a credibility determination on this issue. Based on the testimony presented at the evidentiary hearing, the Court

found that Mr. Gilmore was more credible than Garcia-Gonzalez and that his version of the events more believable. The Court thus found that Mr. Gilmore consulted with Garcia-Gonzalez and told him about his appellate rights. In particular, the Court finds that Garcia-Gonzalez was aware of his appellate rights because he was advised of them by the Court. He never took any action to file a notice of appeal, either by asking counsel or by writing to the Court himself. He also took no affirmative action to inquire into the status of any appeal, which greatly undermines any claim that he thought Mr. Gilmore had filed an appeal. The Court further credits Mr. Gilmore's testimony that, had he been asked to appeal, he would have filed a notice of appeal.

### III.  MOVANT'S ALLEGATIONS

As noted in the order setting the evidentiary hearing, Garcia-Gonzalez's written § 2255 motion lists five grounds for relief. In addition to his failure to appeal claim, Garcia-Gonzalez also urges the following grounds for relief:

> 1.  Counsel was constitutionally ineffective at sentencing for failing to object to the four-level leadership enhancement under U.S.S.G. § 3B1.1(a).;
>
> 2.  The Court erred in imposing the leadership enhancement;
>
> 3.  Counsel was constitutionally ineffective at sentencing for failing to object to the enhancement for the number of aliens transported; and
>
> 4.  Counsel was constitutionally ineffective at sentencing for failing to object to the 2-level enhancement for reckless endangerment of the aliens being transported.

(See generally D.E. 151-53.)

## IV.  ANALYSIS

**A.     28 U.S.C. § 2255**

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).  "[A] collateral challenge may not do service for an appeal."  United States v. Frady, 456 U.S. 152, 165 (1982).

**B.     Ineffective Assistance of Counsel Based on Counsel's Alleged Failure to Appeal**

When evaluating an ineffective assistance claim based upon counsel's alleged failure to file an appeal, this Court is guided by Roe v. Flores-Ortega, 528 U.S. 470 (2000).  That case explains that where a defendant asks that an appeal be filed, and the attorney does not file one, the attorney's conduct is deficient.  Flores-Ortega, 528 U.S. at 478.  As noted by the Court at the conclusion of the evidentiary hearing, the Court found that Garcia-Gonzalez was not credible, and found that Gilmore testified credibly.  Thus, the Court found that Garcia-Gonzalez never asked Gilmore to file an appeal on his behalf.  Accordingly, the fact that Gilmore did not file an appeal was not *per se* deficient, because the Court found that Garcia-Gonzalez never asked him to appeal.  See id.

The Court turns next, then, to the issue of whether Gilmore **consulted** with Garcia-Gonzalez

about his appellate rights. As explained by the Supreme Court in Flores-Ortega:

> In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question of whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal. . . . If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal.

528 U.S. at 478.

Gilmore credibly testified that, after sentencing, he had a discussion with Garcia-Gonzalez about his right to appeal and that he told Garcia-Gonzalez he would file a Notice of Appeal, if asked. Both Garcia-Gonzalez and Mrs. Gilmore testified that they understood each other during conversations when she was translating. Thus, there is no evidence of any miscommunication due to any language barrier or translation. As noted, the Court finds Gilmore's testimony credible and finds both that he did consult with Garcia-Gonzalez about his appellate rights and that Garcia-Gonzalez never asked him to appeal. Thus, Gilmore was not deficient. See Flores-Ortega, supra. For these reasons, Garcia-Gonzalez's claim that he was denied effective assistance of counsel due to his counsel's failure to appeal fails and is denied.

**C.     Claim That Court Misapplied Sentencing Guidelines**

To the extent Garcia-Gonzalez is making a direct claim that the Court erred at sentencing in applying any of the enhancements to his sentence, such a claim is not cognizable here. United States v. Williamson, 183 F.3d 458, 462 (5th Cir. 1999) (a district court's alleged misapplication of the sentencing guidelines cannot be challenged in a § 2255 motion).

Moreover, Garcia-Gonzalez has wholly failed to show any error by the Court. The evidence

adduced at the two days of trial in this case, and the testimony of various witnesses as set forth in the Presentence Investigation Report, amply support each and every enhancement applied by the Court. (See generally PSR at ¶¶ 4-15.)

**D.     Claims of Ineffective Assistance of Counsel At Sentencing**

Garcia-Gonzalez's claims of ineffective assistance of counsel at sentencing are properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).

To establish prejudice as a result of alleged errors at sentencing, a § 2255 movant must show that there is a reasonable probability that, but for counsel's alleged errors, the sentencing would have been different. See United States v. Phillips, 210 F.3d 345, 350 (5th Cir. 2000). This requires him to show a reasonable probability that he would have received a lesser sentence. United States v. Grammas, 376 F.3d 433, 438-39 (5th Cir. 2004).

If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

As noted, Garcia-Gonzalez argues that his sentencing counsel was constitutionally ineffective for failing to raise several challenges to the Presentence Investigation Report. Specifically, he claims Gilmore should have objected to the leadership enhancement, to the enhancement based on the number of aliens, and to the enhancement for reckless endangerment.

As discussed herein, the Court has reviewed each of these possible challenges and concludes that, even had such objections been raised, they would not have been sustained and would not have resulted in a different sentence. Accordingly, Garcia-Gonzalez has failed to show either deficiency or prejudice. See United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

### 1.     Failure to Challenge Leadership Enhancement

During his evidentiary hearing, Garcia-Gonzalez attempted to raise again the issue of whether he should have received the leadership enhancement. Gilmore's affidavit speaks to this issue. In his affidavit, Gilmore denies that he was ineffective for failing to object to the PSR. As to the leadership enhancement, he avers:

> I also did not file an objection to the leadership adjustment, recommended in his PSI Report. Mr. Garcia-Gonzalez exercised his right to jury trial in this case. The government had put on the majority of its case, when Mr. Garcia-Gonzalez decided to plead guilty. The evidence produced at trial, including testimony and recorded conversations, proved conclusively that Mr. Garcia-Gonzalez was a leader/organizer. We discussed the adjustment and I informed Mr. Garcia-Gonzalez that an objection to that increase would be, in my opinion, frivolous. Mr. Garcia-Gonzalez never

10

>> instructed me to object to the leadership adjustment, or any other matter contained in the PSI Report in his case.

(D.E. 177, Gilmore Aff. at ¶ 2.)

The Court agrees with Gilmore's analysis of this issue. As set forth in the PSR, there was ample evidence to support the leadership enhancement. (See PSR at ¶¶ 4-15.) As noted by Gilmore, the evidence presented at the trial on this issue included recorded conversations and showed that the enhancement was applicable. Even if counsel had raised the issue, therefore, the Court would not have declined to apply the enhancement. Garcia-Gonzalez's claim of ineffective assistance of counsel based on the failure to challenge the leadership enhancement thus fails. See Kimler, 167 F.3d at 893.

### 2. Failure to Challenge Enhancement Based on Number of Aliens and to Challenge Enhancement Based on Reckless Endangerment

Garcia-Gonzalez contends that Gilmore was also ineffective for failing to challenge enhancements to his base offense level for: (1) the number of aliens transported; and (2) reckless endangerment. The evidence in the case, however, fully supports both enhancements. Specifically, the evidence in this case showed that Garcia-Gonzalez was involved in at least two instances in which large groups of aliens were transported. The first load occurred on May 17, 2006. Garcia-Gonzalez was driving a lead vehicle, but was determined to be the organizer of the transportation of the aliens, based on the testimony of a number of witnesses. The group of aliens was picked up by a white pickup truck, while a Trailblazer driven by Garcia-Gonzalez was leading the white pickup truck. Once a marked unit initiated its emergency lights, the driver of the pickup truck began speeding in an effort to flee and swerved across traffic before driving straight off the road. The vehicle stopped and the driver and front seat passenger of the truck fled, although the driver was

later apprehended. Fourteen aliens were found within the pickup truck. During the initial observations of the white pickup truck, aliens were observed in the bed of the truck by law enforcement in a helicopter. (PSR at ¶¶ 4-6 (describing all details set forth in the preceding paragraph).)

The second load came to the attention of law enforcement officials when a cooperating source advised that Garcia-Gonzalez was expecting a second load of illegal aliens to be picked up later the same evening, May 17, 2006, in a blue Ford F-150 pickup. A blue truck matching that description was located in a motel parking lot in Premont, Texas and a Dodge Neon registered to Garcia-Gonzalez was found in the same lot. At approximately 12:30 a.m., agents observed the Neon exit the lot and travel south on Highway 281. A short time later, agents observed a co-defendant, Jose Luis Prado, enter the blue pickup and depart the lot. The pickup truck followed behind the Neon and a traffic stop was initiated on the Neon. The driver was Garcia-Gonzalez and he was later arrested for conspiracy to transport illegal aliens. Prado delivered the blue pickup truck for a group of aliens in the brush, and was picked up by the informant. (PSR at ¶¶ 7-10.)

At approximately 2:00 a.m. on the same date (May 18, 2006), agents learned from the informant that the group of illegal aliens, including the guide, had gone back into the brush to hide, leaving the load vehicle behind. They were reportedly expecting to be picked up from the brush off of County Road 417. At approximately 2:30 a.m., agents observed a red Chevrolet pickup truck, driven by the informant, pick up a group of aliens coming out of the brush on County Road 417. A stop was conducted and fifteen aliens were found in the truck, including nine aliens lying in the back of the truck and several sitting on the floorboard.

The PSR also noted that temperatures in the area on May 17, 2006 ranged from 59 degrees

during the early morning hours (5:45 a.m. to 7:05 a.m. ) to 98.6 degrees in the evening hours (4:25 p.m. to 5:05 p.m.). On May 18, 2006, the temperature in the area ranged from 64.4 degrees in the early morning hours (5:25 a.m. to 7:25 a.m.) to 100.4 degrees during the evening hours (4:05 p.m. to 5:45 p.m.). (PSR at ¶¶ 7-10.)

The information in the Presentence Investigation Report clearly shows that law enforcement officials observed 14 illegal aliens being transported in the first load and then 15 illegal aliens in the second. The Court sees no plausible basis for objecting to the number of aliens, and Garcia-Gonzalez has provided none.

Similarly, as to the enhancement for reckless endangerment, the Court sees no basis for counsel to have objected to the enhancement. The enhancement applies where the offense "involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." U.S.S.G. § 2L1.1(b)(5). The Fifth Circuit has affirmed the application of the enhancement under U.S.S.G. § 2L1.1(b)(5) in cases where aliens are smuggled in the bed of a pickup truck while driving on the highway. United States v. Cuyler, 298 F.3d 387, 391 (5th Cir. 2002).

Additionally, the number of aliens being transported far exceeded the capacity of vehicles in which they were being smuggled. This is another factor that supports the application of the enhancement. See U.S.S.G. § 2L1.1, appl. note 6 (application is applicable to a "wide variety of conduct" including "carrying substantially more passengers than the rated capacity of a motor vehicle").

Finally, the high temperatures in the area and the fact that the aliens were led through the brush for days in the south Texas heat also supports application of the enhancement. See United States v. Garcia-Guerrero, 313 F.3d 892, (5th Cir. 2002) (affirming application of the enhancement

in a case where a transporter led aliens through the hot South Texas brush in the heat of the summer with inadequate water and food). In the instant case, one material witness testified that the group walked for three days and three nights through the brush before being picked up, and that when they entered the truck, some of the female aliens were fainting. (PSR at ¶¶ 12-13.) Another testified that, during the trek through the brush, she suffered from fatigue, leg pain, and blisters on her feet that were bleeding, and that another older male in the group also had bleeding blisters on his feet. She stated that at one point she fell behind the group due to her physical pain and weakness and became scared, but eventually came upon the group when they stopped to rest. (PSR at ¶ 14.) These facts, too, support the enhancement.

There were various reasons, accordingly, why the enhancement for reckless endangerment was applicable. Again, Garcia-Gonzalez does not offer any plausible basis on which counsel could have objected to the enhancement. Accordingly, he has wholly failed to show a reasonable probability that his sentence would have been different had counsel raised the issue. His claims of ineffective assistance of counsel at sentencing thus fail. His § 2255 motion is DENIED in its entirety.

**E.     Certificate of Appealability**

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Garcia-Gonzalez has not yet filed a notice of appeal, this Court nonetheless addresses whether he would be entitled to a COA. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (a district court may *sua sponte* rule on a COA because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a

substantial showing of a denial of a constitutional right on the issues before that court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").[4]

A COA "may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

Based on the above standards, the Court concludes that Garcia-Gonzalez is not entitled to a COA as to any of his claims. That is, reasonable jurists could not debate the Court's resolution of any of his ineffective assistance of counsel claims or his claim that the Court erred in applying the leadership enhancement to him.

---

[4] As of December 1, 2009, absent contrary Congressional action, amended Rule 11(a) of the RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS will become effective. This rule will require a district court to issue or deny a COA at the time the court enters a final order adverse to the movant. Although amended Rule 11(a) is not yet effective, the practice it requires is a sound one that the Court employs now. Nothing in the current version of the § 2255 rules prohibits the Court from addressing a COA prior to a notice of appeal being filed.

15

## V. CONCLUSION

For the foregoing reasons, Garcia-Gonzalez's motion pursuant to 28 U.S.C. § 2255 (D.E. 151) is DENIED. Garcia-Gonzalez is also denied a Certificate of Appealability.

It is so ORDERED this 26th day of August, 2009.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE